**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**TRISHA DORAN, M.D.,**

                        Plaintiff,

     **v.**

**ROBERT McDONALD, SECRETARY**
**FOR THE UNITED STATES**
**DEPARTMENT OF VETERANS**
**AFFAIRS, et al.,**

                 Defendants.

**Case No. 2:16-cv-532**

**Judge Graham**

**Magistrate Judge Deavers**

## <u>OPINION & ORDER</u>

       This matter is before the Court on a voluminous record and dueling dispositive motions. First, Plaintiff Trisha Doran, M.D.'s Motion for Summary Judgment, (Doc. 30); and second, Defendants' Combined Motion to Affirm the Decision of the Disciplinary Appeals Board and Response in Opposition to Plaintiff's Motion for Summary Judgment, (Doc. 31).

**I) Background**
   **A) Legal Background**

       "Title 38 provides a comprehensive regulatory scheme for employees of the VA [the U.S. Department of Veterans Affairs." *Fligiel v. Samson*, 440 F.3d 747, 752 (6th Cir. 2006). The Secretary of the VA may appoint personnel, like physicians, who are "necessary for the health care of veterans." 38 U.S.C. § 7401. Dr. Doran completed a two-year probationary period, and she qualified as a permanent employee. *See* 38 U.S.C. § 7461(c)(1). As a permanent employee, Dr. Doran has the right to appeal to a Disciplinary Appeal Board (a "DAB") if she suffers a major adverse employment action stemming from a problem of "professional conduct or competence." *See* 38 U.S.C. § 7461; *Fligiel*, 440 F.3d at 750. Dr. Doran suffered a major adverse action when the VA terminated her employment. *See* 38 U.S.C. § 7461(c). There is no debate here: Dr. Doran's discharge involved a question of professional conduct or competence, so she appealed to a DAB. The DAB must follow the procedures described in 38 U.S.C. § 7462. *Fligiel*, 440 F.3d at 750.

Section 7462 details certain due process rights that the VA must provide to Dr. Doran. These include: (1) "[a]dvance written notice" of the charge, potential adverse action(s) the employee could suffer, the law violated, and a file containing all the evidence supporting each charge; (2) an opportunity to answer the charges both orally and in writing and to submit evidence to a higher ranking official than the one who made the charge; (3) the entitlement to be represented by an attorney; (4) a written, reasoned decision on the charges; (5) the right to judicial review of the DAB's written decision. *See generally* § 7462.

## B) Factual Background

The VA administers the Veterans Health Administration (the "VHA"). In turn, the VHA operates the Chalmers P. Wylie VA Ambulatory Care Center in Columbus, Ohio (the "Columbus VA Center"), where Dr. Doran worked. Dr. Doran is a licensed physician, and she is board certified in internal medicine and gastroenterology. (AR 00083)[1]. Once she completed a Gastroenterology Fellowship at The Ohio State University, she took a job as a Gastroenterologist at the Columbus VA Center in late 2008. *Id.* She received several additional certifications during her first six years at the Columbus VA Center. *Id.*

### 1) Annual Reviews

Dr. Doran worked from 2008 through 2013 with good reviews. Her overall rating for each year was "Outstanding," (AR 000087–94), which in the parlance of the Columbus VA Center meant she "consistently exceeded reasonable expectations to an exceptional degree." (AR 00010). Her performance reviews contain a narrative summary with detailed comments on Dr. Doran's performance. Here are some examples. In the report covering October 2008 through September 2009, the report notes that "Dr. Doran has made an important contribution to care of the GI patient [sic] at the VAACC [the Columbus VA Center] by introducing new diagnostic modalities since joining the staff." (AR 000087). The review goes on to note that Dr. Doran is a "competent gastroenterologist" with excellent "clinical judgment" who performs endoscopies[2] "with an extremely low complication rate." (*Id.*). It notes that Dr. Doran has educated "other providers and clinical staff" in the new procedures she introduced, and she goes above and be-

---

[1] As Defendants observe, the massive administrative record contains many duplicate documents, so while the document cited may appear elsewhere, only one record citation is included for each reference.

[2] An endoscopy is a "visual inspection of any cavity of the body by means of an endoscope." *Endoscopy*, *Dorland's Illustrated Medical Dictionary* 620 (32d ed. 2012).

yond her duties by spending extra hours providing patient care. (AR 000088). In short, Dr. Doran's first assessment concludes that she "is a great asset to our facility." (*Id.*).

Her next annual review wasn't quite as glowing, but it was still positive. Only in one category did Dr. Doran not score the highest rating. (AR 000089). The narrative review notes that she is "extremely hard working," she is "an outstanding teacher," and she performs endoscopies "with acceptable complication rates." (*Id.*).

Dr. Doran's third yearly assessment rated her highly. Many of the same commendations were repeated, and Dr. Doran added a new leadership role to her other roles at the Columbus VA Center, and she "excelled in her new leadership position." (AR 000091–92). The assessment did note that Dr. Doran "has a low complication rate but did have one perforation." (AR 000091).

Dr. Doran's fourth yearly assessment rated her highly. It noted that she taught residents endoscopy technique on a regular basis and "is the clinical champion for hepatitis C at our facility." (AR 000093–94). The report also noted that Dr. Doran did have one perforation, and that "[s]he needs to improve on her response when her plans are not implemented." (AR 000094). The report concluded that Dr. Doran was still "an outstanding asset to our department." (*Id.*).

Things changed with Dr. Doran's fifth yearly assessment, covering October 2013 through September 2014. Dr. Doran's overall rating was "Low Satisfactory," the second lowest possible overall rating. (AR 000106). The report describes new problems with Dr. Doran's performance. First, the report's assessment of Dr. Doran's clinical competence was that she "has difficulty effectively managing her patient panel in reasonably expected time-frames," "her practice style is inefficient," and her complication rate, while within standards, is higher than average. (AR 000106). Second, the report noted that Dr. Doran's educational competence had suffered. For example, she only completed training requirements at the deadline and after multiple reminders from management. (*Id.*). She also no longer attended lectures "due to her clinical inefficiencies." (*Id.*). Third, Dr. Doran's administrative competence suffered. Specifically, Dr. Doran failed to submit peer reviews, failed to stay up-to-date on recurring computer-based training, and she submitted her re-credentialing information at the last minute, which caused some administrative difficulties. (AR 000107). Fourth, the report noted some frustrating personal qualities. Dr. Doran expressed frustration about her workload, had requested changes to her responsibilities and time, and she wasn't communicating well with her colleagues. (*Id.*). The report concluded that "Dr. Doran's performance has declined since her last evaluation. She often appears distracted or pre-

occupied and continually expresses her displeasure with the work requirements and administrative time permitted. She seems to lack the ability to cope with normal stressors associated with the roles and responsibilities of a physician." (*Id.*).

Several months after this negative review, on February 23, 2015, Dr. Glen Borchers wrote a letter to the Columbus VA Center Chief of Staff, Dr. Marc Cooperman in which Dr. Borchers expressed "patient safety concerns related to the care provided by Dr. Trisha Doran MD." (AR 000744–745). Specifically, Dr. Borchers raised concerns about four procedures Dr. Doran performed and concerns expressed by head nurse Cynthia Wolfe. (AR 000744). Dr. Borchers's concerns were so serious, he recommended a board review of her care of four different patients. Dr. Borchers was the Chief of Gastroenterology at the Columbus VA Center and the official that gave Dr. Doran her last two annual reviews. (AR 000094, 000107).

### 2) Review of Four Patient Cases

The VA did several rounds of reviews of Dr. Doran's care of four different patients. The DAB's analysis is structured around a discussion of these four patients. There are numerous analyses of the four patients in the record. The Court uses the "Proposed Removal and Revocation of Clinical Privileges" letter, (AR 000001–04), to outline the charges against Dr. Doran for each procedure.

### (i) Patient A (January 26, 2015)

Patient A came to the Columbus VA Center for an esophagogastroduodenoscopy[3] (an "EGD") and a colonoscopy. Patient A's medical history included diagnoses for diabetes, hypertension, coronary artery disease, chronic kidney disease, dyslipidemia[4], mood disorder, syncope and collapse, dizziness, gout, and other ailments. (AR 000818). "The procedure was not done under monitored anesthesia care (MAC)." (AR 000001). Dr. Doran instead performed the anesthesia procedure herself, giving the patient "a rapid dose of 100 milligrams of Fentanyl and 2 milligrams of versed intravenous push." (*Id.*). "The patient began to desaturate[5], and became unresponsive. A code blue was called." (*Id.*). At this point, Patient A had no heartbeat (asystole). Before a "code blue team" arrived to treat Patient A, Dr. Doran was the physician in charge of

---

[3] "Endoscopic examination of the esophagus, stomach, and duodenum." *Esophagogastroduodenoscopy, Dorland's* at 648. The duodenum is "the first or proximate portion of the small intestine." *Duodenum, Dorland's* at 573.
[4] "Abnormality in, or abnormal amounts of, lipids and lipoproteins in the blood." *Dyslipidemia, Dorland's* at 578.
[5] Referring to the saturation of blood oxygen levels.

the emergency. Dr. Doran stated that she gave several verbal orders for Narcan[6], but apparently "[n]o other witnesses, including the registered nurse initially in the room with [Dr. Doran] and the patient, heard any of [Dr. Doran's] verbal orders." (AR 000002). Patient A was eventually revived, but he was taken by paramedics to a hospital. (AR 000784).

Dr. Doran calls this event a "sedation reaction"; Defendants say Patient A was "critically ill and was hospitalized for over 30 days" after the procedure. (AR 000001).

### (ii) Patient B (January 27, 2015)

The day after the issue with Patient A, Dr. Doran performed an EGD on Patient B. (AR 000001). Dr. Doran, performed the EGD without MAC sedation, that is, she performed the anesthesia herself. (*Id.*). Patient B was a 65-year-old male "with cirrhosis, sleep apnea, atrial fibrillation, diabetes, retinopathy, chronic renal failure, and had a BMI of 39." (*Id.*). The procedure lasted for more than 75 minutes, and after the procedure Patient B's "abdomen was hard and distended." (*Id.*). Patient B was sent from the VA to urgent care to check to see if there had been a perforation during the EGD. (*Id.*). There was no perforation, and Dr. Doran reports that the distention of Patient B's abdomen was due to air being trapped in the patient's small bowel which he belched out after the procedure.

### (iii) Patient C (October 17, 2014)

Patient C presented for a colonoscopy during which Dr. Doran "found a large tumor in the ascending colon as well as multiple other significant polyps. [Dr. Doran] attempted to remove all the polyps despite the fact that a total colectomy would likely be required." (*Id.*). This prolonged the procedure, and Patient C lost between 500–1000 cc's of blood. (AR 000002).

### (iv) Patient D (June 20, 2014)

Dr. Doran performed a sigmoidoscopy[7] and anal tattooing[8] to treat Patient D's anal pruritus[9]. (AR 000003). "Anal tattooing is not part of the core privileges for a gastroenterologist." (*Id.*). Patient D "developed a complication, scrotal swelling, after the procedure and sought care

---

[6] Narcan is the trade name for a drug that's used to reverse narcotic overdoses. Specifically, it is "used in the treatment of opioid toxicity, to reverse opioid-induced respiratory depression, and as an adjunct in the treatment of hypotension associated with septic shock." *Narcan*, *Dorland's* at 1232.

[7] "Inspection of the sigmoid colon through a sigmoidoscope." *Sigmoidoscopy*, *Dorland's* at 1708. The sigmoid colon is the "S-shaped part of the colon that lies in the pelvis." *Colon, sigmoid*, *Dorland's* at 387.

[8] Anal tattooing "involves intradermal injection of a solution of 1% methylene blue, bupivacaine, and lidocaine." D. Maron & S. Wexner, *Disorders of the Anorectum and Pelvic Floor*, GASTROENTEROLOGY CLINICS OF NORTH AMERICA, Vol. 42, Nu. 4 (December 2013).

[9] "Intense chronic itching in the anal region." *Pruritus (ani)*, *Dorland's* at 1540.

at a private hospital." (*Id.*). Specifically, Dr. Cooperman reported that Patient D "ended up in the emergency room with a massively swollen blue scrotum." (AR 001975).

### 3) Timeline of Disciplinary Procedure

The incidents with these four patients formed the core of the facts reviewed by the various boards at the Columbus VA Center. The procedure that followed is somewhat convoluted in the record, but here's the best the Court can tell what happened, in chronological order:

**(i) (February 23, 2015)** Dr. Borchers wrote his letter to Dr. Marc Cooperman, expressing concern about Dr. Doran's performance. (AR 000744). Dr. Borchers cited the cases with patients A, B, C, and D in support of his recommendation of a board review. That same day, Dr. Doran received notice that a Professional Standards Board (a "PSB") had "been appointed to review the quality of care provided by you at this facility." (AR 000740). The concerns expressed in the notice were the same as those identified by Dr. Borchers in his letter, and Dr. Cooperman was the official to whom Dr. Doran was to send any questions or correspondence. (*See id.*). The notice said that the PSB "will make recommendations to the Medical Executive Board (MEB)." (*Id.*). After Dr. Doran had "an opportunity to present evidence regarding the PSB findings to the MEB," the MEB would make recommendations to Mr. Sullivan, the Director of the Columbus VA Center. (*Id.*).

Dr. Doran also received notice that the Credentialing and Privileging Committee had found that Dr. Doran performed a procedure at the Columbus VA Center without the appropriate privileges. Specifically, Dr. Doran performed a "Flexible Sigmoidoscopy with Perianal Skin Staining, which is not part of the gastroenterology core privileges." (AR 000743).

Confusingly, Dr. Doran's response to the concerns raised by Dr. Borchers in his February 23 letter is dated February 17, 2015, but the Court presumes this to be a mistake. (AR 000747).

**(ii) (May 7, 2015)** An Administrative Investigation Board ("AIB") filed its report of an investigation into whether Dr. Doran "used verbal orders for Narcan during the January 26, 2015 care and treatment of [Patient A]; if so, were the verbal orders executed; if Dr. [Doran] amended the medical records of four patients . . . after February 23, 2015; and if Dr. [Doran] asked any staff member to amend the medical records for the same four patients after February 23, 2015." (AR 000341). The AIB reviewed medical records and interviewed 16 individuals in its investigation. (AR 000341–342). The AIB made numerous findings of fact, reviewing the conflicting accounts of what happened during the code blue with Patient A. (*See* AR 000342–

346). The AIB reached six conclusions: (1) Dr. Doran did not give a verbal order for Narcan in response to the code blue of Patient A; (2) Dr. Doran did amend the medical record of Patient A, specifically to include a statement about her giving verbal orders for Narcan; (3) Dr. Doran asked other Columbus VA Center staff to amend the medical record for Patient D after she received notice of the investigation against her on February 23, 2015; (4) Dr. Doran asked other Columbus VA Center staff to amend the medical records for Patient A, but not necessarily after February 23, 2015; (5 & 6) Dr. Doran did not ask staff to amend the records of Patient C. (AR 000346–347). The AIB provided only abstract recommendations that "[a]ppropriate corrective action" be taken in regards to its conclusions.

**(iii) (June 2, 2015)** Dr. Cooperman issued Dr. Doran a notice of Proposed Removal and Revocation of Clinical Privileges. (*See* AR 000001–04). Dr. Cooperman's notice described four charges against Dr. Doran: (1) failure to provide the standard of care for Patients A, B, and C; (2) Lack of candor, for attempting to have a nurse corroborate her account of the events with Patient A; (3) Inappropriately documenting in a patient record, for adding a note to Patient A's file about six weeks after the event and while she knew the event was under investigation; and (4) Performing a procedure without the appropriate privileges, for performing the anal tattooing procedure on Patient D.

**(iv) (July 22, 2015)** Dr. Doran responded to the notice of proposed removal in writing. (*See* AR 000005–000054). Dr. Doran disputed Dr. Cooperman's conclusions and recommendations.

**(v) (August 12, 2015)** Mr. Sullivan wrote to Dr. Doran informing her that "a decision has been made to remove you effective August 21, 2015 and revoke your privileges based on the" reasons stated in Dr. Cooperman's charge. (AR 000171). Mr. Sullivan noted that Dr. Doran's "oral and written replies were carefully considered along with all the evidence developed." (*Id.*). Mr. Sullivan also considered "other factors including your years of service, your past work record, the seriousness of the offense(s) with which you have been charged, and whether there are any mitigating or extenuating circumstances which would justify mitigation of the proposed penalty." (*Id.*). Mr. Sullivan concluded that "the sustained charge(s) against you are of such gravity that mitigation of the proposed penalty is not warranted, and that the penalty of removal is appropriate and within the range of reasonableness." (*Id.*).

**(vi) (September 15, 2015)** Dr. Doran appealed her termination to the VA Under Secretary of Health, asserting both substantive and procedural errors in the decision making process. (AR 000946–951). The Principal Under Secretary for Health appointed Dr. Ciaran O'Hare as the chairperson for a Disciplinary Appeals Board (DAB). (AR 000942). The DAB consisted of the chairperson, Dr. O'Hare, the DAB secretary, Dr. Yasser Sakawi, DAB member, Dr. Joseph Pisegna, and DAB technical advisor Shauna Wagner, an "Employee Relations Specialist." (*Id.*).

**(vii) (Winter 2015–2016)** The DAB worked through pre-hearing proceedings. Dr. Doran moved to dismiss the charges, (AR 001170–1184), the DAB denied Dr. Doran's motion, (AR 000975–979), and the DAB made various evidentiary rulings, including identifying 18 witnesses who would be called to present testimony at the DAB hearing, (AR 000978–979).

**(viii) (January 25–26, 2016)** The DAB held its hearing on January 25–26, 2016. (*See* AR 001270, 001742).

**(ix) (March 21, 2016)** The DAB issued its findings. (*See* AR 002298–2319).

### 4) The DAB's Decision

Dr. Doran argued in her appeal to the DAB that the VA's decisions

> were in error and should not have been taken because the merits of the charges were unsupported by examination of the entirety of the evidence, the charges were not proven by a preponderance of the evidence, Dr. Doran was not afforded unbiased due process due to significant unrecorded exparte communication that lead to arbitrary and capricious decision making. There was no reasonable effort made by the Agency to reconcile conflicting statements.

(AR 000947).

The DAB conducted a two-day hearing, examining 16 witnesses and reviewing numerous documents. (*See* AR 002301–2302; 001744). The DAB decided that, while it "had concerns with some aspects of how the Agency formulated and decided the charges. . . . at the end of the proceedings the Board was satisfied that it had gathered all the evidence it required to make a fair decision, and that Dr. Doran had been afforded due process." (AR 002299). The DAB identified the main sources of information against Dr. Doran as (1) "the outside Peer Reviews," (2) Dr. Borchers's "presentation of them and other facts before Dr. Cooperman, the PSB and the MCEB[10]." (*Id.*). The DAB then laid out the procedure it used to arrive at its decisions, including which evidence it found credible and which evidence it did not.

---

[10] MCEB is not an acronym the Court has discovered elsewhere in the record; the Court presumes this to be a typo of a frequently recurring acronym, "MEB," which stands for "Medical Executive Board." (Defs.' Mot. at 9 n.7).

The DAB found that the peer reviews of the cases brought against Dr. Doran "were of poor quality," "with the exception of Dr. Greggory Gibbons, MD, which was well reasoned and presented conclusions that were close to those arrived at by the Board." (AR 002299). The DAB found that in some instances Dr. Borchers's statements before the PSB and the MEB "were exaggerations or misrepresentations, and were different from his statements under oath." (*Id.*). The DAB listed many examples of Dr. Borchers's problematic testimony. (*Id.*).

The DAB identified a few relatively minor errors in the VA's procedure leading up to the DAB's review. The DAB found that the events surrounding Charge 4 (performing procedure without proper privileges) had already been addressed through other VA processes. (AR 002300). The DAB found that there were some problems with the report by the AIB. First, it found that the AIB's composition "compromised its objectivity, and was likely to contain members who had direct involvement in the matter being investigated." (*Id.*). Second, the AIB didn't contain "the recommended member with 'training and experience similar to the subject under investigation.'" (*Id.*). Third, the AIB gave weight to the testimony of people who weren't present for the early part of the emergency with Patient A; "[o]nly Dr. Doran, Nurse Farand and Nurse Gerkin were present at that moment." (*Id.*). Finally, the AIB's conclusions were technically inaccurate on several points. (*Id.*).

In a broader finding, the DAB found that "there was no culture of safety." (*Id.*). The DAB outlined several systemic issues at the Columbus VA Center that contributed to the issues with Dr. Doran. (*See* AR 002300–2301). The cultural problems included a failure to intervene with Dr. Doran sooner, considering she was "having difficulties from mid-2014," failure to follow established VA procedures, failure to establish standards for the type of sedation Dr. Doran performed, failure to immediately investigate the circumstances of Patient A, and failure to communicate regarding the policy change for storing Narcan in a locked drawer. (AR 002300–2301). But the DAB found that "[d]espite these issues, the overall outcome was not affected." (*Id.*).

Next, the DAB discussed the credibility of the witnesses, most importantly Dr. Doran and Dr. Borchers. It found some of Dr. Doran's testimony "evasive" and "in disagreement with her earlier documented responses." (AR 002301). The DAB stated that "the Board often gave more credence to other evidence when it was in conflict with that presented by Dr. Doran." (*Id.*). The DAB found Dr. Borchers's testimony "should be looked at having consideration that there were personal difficulties between Dr. Borchers and Dr. Doran, and that he had been pursuing a course

of progressive discipline against Dr. Doran for the preceding 6 months." (AR 002302). The DAB found that Dr. Borchers's "presentations before the PSB and MEB contained many inaccuracies (see above) regarding the details of Patients A, B, C, D, both when summarizing the events, and the outside Peer Reviews." (*Id.*). But, the DAB concluded that Dr. Borchers's "answers before the Board represented truthful answers." (*Id.*).

The DAB then analyzed the four charges against Dr. Doran, breaking the first charge—Failure to Provide the Standard of Care—into three sub-parts (called "specifications").

### (i) Charge 1: Failure to Provide the Standard of Care

*Specification 1:* Patient A.

Patient A had a "sedation reaction" where he went asystole and a code blue was called after Dr. Doran administered anesthesia in preparation for a procedure. The DAB found, unanimously, that Dr. Doran failed to provide treatment to Patient A that met the standard of care. The DAB found that Dr. Doran "inadequately and inappropriately assessed the risk that sedation posed to the patient's airway. The patient's co-morbidities and airway challenges were obvious," (AR 002303); Dr. Doran's dosage of Fentanyl and Versed given as a bolus[11] was "an excessive dosage," (*id.*); "the Board is critical of Dr. Doran's performance during the emergency," (*id.*); and "[a]ll reviews of this case are in agreement that the dosages and bolus administration method were errors," (*id.*).

The DAB found that Patient A suffered some serious consequences after the incident at the VA, but the details of Patient A's condition aren't in the DAB's opinion. At the time of the DAB's opinion on March 21, 2015, it wrote that Patient A "remains hospitalized in critically ill condition." (AR 002303). The DAB said that Patient A suffered a "severe injury" which resulted in "a significant tort claim . . . against the facility." (AR 002310). But the DAB concluded by unanimously sustaining specification 1, that Dr. Doran failed to provide the standard of care in her treatment of Patient A. (AR 002303).

*Specification 2:* Patient B

Dr. Doran performed an ECG on Patient B that took over 75 minutes. Dr. Doran performed a similar procedure on Patient B about six weeks earlier, and the purpose of the two procedures was to remove a number of gastric polyps. Patient B had many co-morbidities like obesi-

---

[11] In medicine, "a large dose of a substance given by injection for the purpose of rapidly achieving the needed therapeutic concentration in the bloodstream." *Bolus*, *Merriam-Webster Unabridged*, http://unabridged.merriam-webster.com/unabridged/bolus.

ty, renal failure, and anemia. The DAB noted that third-party reviewers "were both critical of [Dr. Doran's] care." (AR 002304). The DAB concluded that "[t]he decision whether to perform multiple endoscopies to remove the gastric polyps is not clear cut either way." (*Id.*). A major GI bleed was a risk, but "it was reasonable to perform [the procedure] in stages." (*Id.*). And while the procedure was overly long, most of the time was spent controlling the bleeding that occurred, and the DAB found that the time taken was "not excessive." (*Id.*). And while Patient B underwent a CT scan and was hospitalized because some staff suspected his bowel had been perforated during the procedure, these decisions were, cautious (in the case of the CT scan) and "probably not necessary" (in the case of hospitalization). (*Id.*).

By a 2-1 vote, the DAB did not sustain specification 2 against Dr. Doran.

*Specification 3:* Patient C

Dr. Doran performed a colonoscopy on Patient C. During the procedure, Dr. Doran discovered a large tumor and multiple significant polyps in ascending colon. (AR 002304). She removed the tumor and the polyps, at least 11 in total. (AR 002304–2305). The DAB found that during the nearly 2.5-hour procedure, Patient C lost between 500 – 1000 cc's of blood. (AR 002305). Outside reviewers were critical of Dr. Doran because they thought the entire area of the colon would need to be removed, so removing individual polyps or tumors was unnecessary. Additionally, they thought that certain polyps at the hepatic flexure[12] did not need removed. They were also critical of Dr. Doran's technique in removing a polyp by cutting it off at the colon wall "which leaves no stalk to treat if it bleeds." (AR 002305).

The DAB disagreed with many of the other reviewers' conclusions and rejected Dr. Borchers's analysis and factual recitation. The DAB stated that while it "was surprised that Dr. Doran persisted for over an hour to find the polyp among the clot and irrigation when simpler methods were available . . . . the record shows that the patient was comfortable throughout this time and was discharged later." (*Id.*). The DAB found that there was no evidence that Dr. Doran used an improper technique in removing a polyp or that a full resection was required instead of individual polyp removal. (*Id.*). The DAB did not sustain Specification 3.

In conclusion, the DAB sustained in part Charge 1. A unanimous DAB did not sustain Specifications 2 and 3 against Dr. Doran. But the DAB sustained Specification 1 unanimously.

---

[12] "[T]he right-angle bend in the colon on the right side of the body near the liver that marks the junction of the ascending colon and the transverse colon." *Hepatic flexure*, *Merriam-Webster's Medical Dictionary*, https://www.merriam-webster.com/medical/hepatic%20flexure.

**(ii) Charge 2: Lack of Candor**

Charges 2 and 3 both involve Dr. Doran's attempts to supplement the medical record of Patient A.

The second charge against Dr. Doran is that she tried to re-write the record of events surrounding the code blue with Patient A; she attempted to add a statement to the record that was unsupported by the accounts of other individuals who were eyewitnesses. Dr. Doran says she gave multiple oral orders for Narcan; all the other personnel there at the time say she didn't. After the fact, Dr. Doran made several attempts to include her giving an oral order for Narcan into the medical record for Patient A. Charge 2 describes this as "what appears to be an effort to influence the official accounting of events to fit your narrative." (AR 002306). Dr. Doran "added an addendum to your CPRS note of the incident outlining very specific times that you verbally ordered the Narcan to be given to the patient." (*Id.*). In addition to filing her own note, "approximately one week after the event, [Dr. Doran] asked the licensed practical nurse in the case, Kristen Farand, to write a statement that [Dr. Doran] ordered the Narcan." (*Id.*).

In a 2-1 decision, the DAB did not sustain Charge 2 against Dr. Doran. The DAB found that "Dr. Doran did not give a clearly audible order for drugs, and when asked to clarify she only mentioned Flumazenil and not Narcan, but it cannot consider proven that she never requested them at all, therefore the charge of lack of candor is not proven." (*Id.*). The DAB found that Dr. Doran "should have asked clearly for Narcan when the emergency began, and monitored it being given, and that . . . was not done." (*Id.*).

**(iii) Charge 3: Inappropriately Documenting in a Patient Record**

Charge 3 accuses Dr. Doran of adding a note to Patient A's medical record to indicate that she gave an oral order for Narcan, six weeks after the event with Patient A. This charge is similar to Charge 2, but it seems that in Charge 3 the DAB focused on the timing of the entry rather than whether Dr. Doran's entry was true.

The DAB noted that while delayed entries are "discouraged," "Dr. Doran followed recommended guidelines for delayed entries. They must be dated, signed, reference the original entry, and the reason for their need be explained." (AR 002307). Analyzing Dr. Doran's addendum to the record, the DAB surmised the following:

> Dr. Doran entered a self-serving statement in the medical record, 6 weeks after the events took place and 3 days after the MEB voted to suspend her privileges. It

was also clear that the motivation for placing the note was not to enhance the record but to establish Dr. Doran's version of what took place. The patient's chart is an inappropriate place to place this documentation. Dr. Doran also had a responsibility to the Agency to refrain from actions that would damage its position after the institutional disclosure.

> FINDING: Charge III is sustained in full by Dr. Sakawi and in part by Dr. O'Hare and Dr. Pisegna. Please refer to the attached dissent of Dr. Sakawi.

(AR 002307–2308). Dr. Pisegna's dissent indicates that the DAB sustained Charge 3 by a 2-1 vote. (AR 002311). Dr. Sakawi voted that the charge be sustained. (AR 002315).

### (iv) Charge 4: Performing a Procedure Without the Appropriate Privileges

Dr. Doran was charged with performing "anal tattooing with methylene blue for the treatment of anal pruritus without appropriate privileges." (AR 002308). By a 2-1 vote, the DAB did not sustain the charge because it found "[i]t was not unreasonable for Dr. Doran to consider injection of Methylene Blue as a last line of treatment for the persistent pruritis ani. . . . However, the procedure is unusual, is new to the facility, and has its own set of complications. Dr. Doran made an error in judgment in not discussing this new approach with her colleagues . . . or presenting it to the 'New Procedure Committee[.]'" (*Id.*). The DAB found that Dr. Doran must have erred in her injection of the methylene blue because Patient D experienced a significant scrotal edema,[13] but it appeared to cause no lasting damage and the patient was satisfied with the procedure. (*Id.*).

Procedurally, the DAB noted that if the VA had serious concerns about this procedure, it should have raised them when the procedure happened, about ten months prior to the event with Patient A. Over Dr. Sakawi's dissent, the DAB did not sustain Charge 4. (*Id.*).

Of the six discrete problems that led to Dr. Doran's termination, the DAB sustained only two: Charge 1-Specification 1 and Charge 3. But the DAB upheld the VA's decision to terminate Dr. Doran based on these two charges. It used nine factors in reaching a penalty decision: (1) seriousness of the offense; (2) the employee's position; (3 & 4) prior discipline, length of service, and prior work record; (5) erosion of supervisory confidence; (6) disparate treatment – consistency of penalty with that imposed on other employees; (7) notoriety; (8) potential for rehabilitation; and (9) mitigating circumstances. (AR 002308–2310).

---

[13] "[A]n abnormal infiltration and excess accumulation of serous fluid in connective tissue or in a serous cavity." *Edema*, *Merriam-Webster's Medical Dictionary*, https://www.merriam-webster.com/dictionary/edema.

The DAB decided, 2-1, that "[t]he care of patient A in Charge 1, Specification 1 was so removed from the standard of care, the penalty of discharge is warranted." (AR 002310). The DAB noted that Dr. Doran failed in the assessment, treatment, and response to the emergency with Patient A. The DAB also questioned "Dr. Doran's ability for rehabilitation, and there was a lack of acknowledgement and ownership of her errors. . . . Dr. Doran demonstrated a lack of the insight needed to guarantee confidence that her performance would be improved and be consistently safe in the future." (AR 002311). The DAB concluded that the penalty of discharge was within the range of reasonableness and upheld it.

Dr. Pisegna, who dissented from the DAB's penalty decision, wrote that the Columbus VA Center "did not afford Dr. Doran an opportunity to receive any counseling to correct actions which in the past were felt to result in some disciplinary issues." (AR 002311). Dr. Pisegna found the penalty of discharge to be excessive and wrote that the penalty should have been "no more than a 30 day suspension." (AR 002312).

Drawing some of these strings together, here's what the Court can synthesize. Dr. Doran began at the Columbus VA Center doing excellent work. Something changed, and her work suffered. She and Dr. Borchers had inter-personal conflict, and Dr. Borchers began a course of disciplinary action that ultimately led to her termination. The DAB concluded that while there was some merit to the charges against Dr. Doran, only two could be sustained. However, the DAB found that Dr. Doran's performance with Patient A was egregious enough to merit discharge, especially considering Dr. Doran's failure to accept responsibility for her errors with Patient A.

## II) Standard of Review

Dr. Doran asks the Court to hold unlawful the DAB's action and findings because they are "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) obtained without procedures required by law, rule, or regulation having been followed; or (C) unsupported by substantial evidence." 38 U.S.C. § 7462(f)(2). "The standard of review under § 7462(f)(2) 'directly mirrors the standard for judicial review of other administrative actions.'" *Lerner v. Shinseki*, No. 3:12-CV-00565, 2013 WL 5592906, at *5 (W.D. Ky. Oct. 10, 2013) (quoting *Rajan v. Principi,* 90 F. App'x 262, 263 n. 1 (9th Cir. 2004)). The Court will discuss each of the three standards in the analysis section. *See infra*.

The Court reviews the record that was before the administrative agency. Dr. Doran wants to supplement the already voluminous administrative record with additional exhibits. Defendants oppose Dr. Doran's attempt. If the Court permits additional evidence to be introduced at this late stage, it would convert the statutory review scheme into a de novo review, which would essentially re-write the statute. *See Nat'l Truck Equip. Ass'n v. Nat'l Highway Traffic Safety Admin.*, 711 F.3d 662, 667 (6th Cir. 2013) ("[O]ur role is limited to reviewing the administrative record to determine whether there exists a rational connection between the facts found and the choice made." (internal quotation marks omitted)).

Courts may permit an administrative record to be supplemented if adequate justification exists, "such as when an agency deliberately or negligently excludes certain documents, or when the court needs certain background information in order to determine whether the agency considered all of the relevant factors." *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997) (internal quotation marks omitted) (quoting *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996)). "Courts have suggested that in order to justify supplementation, a plaintiff must make a strong showing of bad faith." *Id.* (internal quotation marks omitted) (quoting *James Madison*, 82 F.3d at 1095).

Here, there's not a strong showing of bad faith. Even the closest thing to a strong showing of bad faith—Dr. Borchers's conduct—wasn't the reason for the VA excluding certain documents. The DAB suggested that Dr. Borchers's testimony was unreliable and he had personal conflict with Dr. Doran, the DAB was able to draw its own conclusions and derive facts from its own review of the evidence.

Additionally, there's no proof that the VA deliberately or negligently excluded certain documents or that the court needs background information to determine whether the VA considered all of the relevant factors. Dr. Doran provides four additional exhibits, which the Court will call Exhibit B, C, D, and E,[14] but she provides no authority or argument as to why the Court should permit her to supplement the administrative record through the admission of these exhibits.

Dr. Doran argues that "Exhibit B" "was part of the DAB record, but was missing from the Judicial Review record." (Pl.'s Resp. at 8 n.6, Doc. 36). But she also argues that the DAB

---

[14] There's no "Exhibit A," and it's not clear why. Dr. Doran doesn't label the exhibits, and Dr. Doran only mentions Exhibits B and E by name.

refused to allow it into the administrative record at all. (*Id.* at 9). "Exhibit B," (Doc. 36-1) is a single-page document with sparse detail. It purports to provide a bare-bones account of "Moderate Sedation Event Reporting" for the time period of January 1, 2014 through December 31, 2015. (*Id.*). It lists four unnamed "GI Provider[s]" with either one, two, or three events; it then notes that "all other GI Providers during this period had no events." (*Id.*). Dr. Doran argues that this was the best comparator to show that none of the other GI doctors who had "sedation events" were disciplined according to the course followed in Dr. Doran's case. Dr. Doran hasn't shown that the VA negligently excluded the document from its review. Exhibit B doesn't provide necessary background information for the Court to understand the VA's decision. The Court will not consider Exhibit B.

Dr. Doran's "Exhibit C," (Doc. 36-2), is a list of VA staff members and the total number of procedures each performed between October 1, 2013 and September 30, 2014. Dr. Doran is in the lead. (*Id.*). Dr. Doran makes no attempt to clarify what this information means or why this should be admitted into the record now, so the Court won't attempt to divine why it should be. The Court will not consider Exhibit C.

Dr. Doran's "Exhibit D," (Doc. 36-3), is a letter that purports to be from Patient D. But the DAB didn't sustain charges against Dr. Doran related to Patient D, so the information from Patient D is not relevant to Dr. Doran's claims here. Dr. Doran makes no attempt to show why Exhibit D should be admitted to the record in this case. The Court will not consider Exhibit D.

Dr. Doran's "Exhibit E," (Doc. 36-4), is entitled "'FACTS IN DISPUTE' ARE FAVORABLE TO DORAN IN THE RECORD," (*id.*). The Court isn't quite sure what that means. The document has no citations to the record, and it appears to be an attempt to synthesize the facts of the administrative record. But the document itself appears to have been created after the close of the administrative record and after the DAB opinion. Dr. Doran provides no reason why the Court should consider it as a supplement to the administrative record, so the Court will not do so.

In conclusion, the Court won't consider any of the exhibits provided by Dr. Doran because none of them meet the standards for supplementing the administrative record.

## III) Analysis

Dr. Doran argues that the DAB decision was arbitrary and capricious, it was obtained without procedures required by law, it was not supported by substantial evidence, and it didn't properly weigh the relevant factors in its decision to uphold the decision to terminate Dr. Doran's employment.

### A) Arbitrary and Capricious

Dr. Doran argues that the DAB's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 38 U.S.C. § 7462(f)(2). The DAB's decision is arbitrary and capricious if the DAB made a "clear error of judgment." *Taylor v. Principi*, 92 F. App'x 274, 276 (6th Cir. 2004). The DAB's decision may be arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (analyzing agency rulemaking procedure); *see also Principi*, 92 F. App'x at 276–77 (applying holding from *Motor Vehicle Mfrs.* to agency adjudication). If it's possible to offer a reasoned explanation for an agency's decision, the decision isn't arbitrary and capricious. *Lerner*, at *5 (quoting *Admin. Comm. of the Sea Ray Emps.' Stock Ownership & Profit Sharing Plan v. Robinson*, 164 F.3d 981, 989 (6th Cir. 1999)). While arbitrary-and-capricious review is not a mere "rubber stamp," *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003), it is still the "least demanding form of judicial review," *id.* (quoting *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1107–08 (7th Cir. 1998) (internal citation omitted)).

Dr. Doran presents several arguments why the DAB's decision was arbitrary and capricious.

### 1) The DAB's finding that Dr. Doran failed to meet the standard of care for Patient A was based on disputed facts, but the DAB stated these facts were undisputed

Dr. Doran argues that the DAB lied by stating that its decision rested on undisputed facts. Dr. Doran argues that the DAB's facts are disputed and don't even "comprise a majority of the evidence or even a substantial portion of it." (Pl.'s Mot. Summ. J. at 37). Dr. Doran argues that the DAB discounted the opinions of four peer reviewers—Drs. Agrawal, Gibbons, Miller, and Frankel—and was therefore dishonest when it claimed that its decision was based on undisputed

facts. Unfortunately, Dr. Doran misconstrues the DAB opinion, even altering certain punctuation to make it seem more in line with her argument than it really is.

The Court must determine whether there's a reasonable explanation for the DAB's decision. There is. There's a reasonable explanation for the DAB discounting most of the peer reviews. The DAB found that several of them "were of poor quality," and all but one of the peer reviews supplied by Dr. Doran were "considered biased and not useful." (AR 02299). The one useful peer review was that of Dr. Greggory Gibbons, MD, which the DAB said "was well reasoned." (*Id.*). And while some of the peer reviews differed on whether Dr. Doran met the standard of care, the DAB essentially performed its own peer review of the treatment of Patients A, B, C, and D.

Furthermore, the DAB's recited facts regarding Patient A that are in fact largely undisputed. Facts, like Patient A's comorbidities and medical history, are not in dispute. The medication and dosage that Dr. Doran used to sedate Patient A are not in dispute. Patient A's asystole response to the medication is not in dispute. The fact that a code blue was called is not in dispute. The fact that Patient A was hospitalized after this event is not in dispute. Dr. Doran asserts that she gave multiple verbal orders for Narcan to be administered; but the DAB found that Dr. Doran did not clearly ask for Narcan at the beginning of the event, which is when it would have been most effective in limiting the consequences to Patient A. The DAB concluded that Dr. Doran "did not *clearly* ask for reversal agents," (AR 002303) (emphasis added), which doesn't mean that she never asked for them. In short, the DAB's findings were based on undisputed facts with regard to Patient A.

While it is true that some of the peer reviewers reached different conclusions from those same facts, that's a different issue entirely. Dr. Doran makes much of the fact that the DAB rejected certain expert opinions, but that's within the DAB's own expertise and that's why the DAB consists of medical doctors and not lawyers – so they can review all the technical medical information and apply their expertise to the facts before them. The DAB didn't overstate its claim when it sustained the charge against Dr. Doran "based on facts that are not in dispute." (AR 002303).

**2) The DAB's decision to terminate Dr. Doran's employment was at least in part due to the outcome for Patient A, but the DAB itself acknowledged that Dr. Doran was not completely responsible for the final consequences for Patient A**

The DAB also noted that Dr. Doran "is not completely responsible for the consequences," to Patient A. (AR 002303). The DAB noted that reversal agents "had been moved from a readily accessible locked drawer to an Omnicell system, hindering and delaying access to them," which the DAB blamed on a failure of communication within the Columbus VA Center and on Nurse Gerkin, who "should have been more familiar with the agent and Omnicell access." (AR 002303). While not completely responsible for the outcome, Dr. Doran was the medical provider whose decision initiated the chain of events that led to calling a code blue on Patient A and Patient A was then hospitalized. In the DAB's conclusion, it notes that "other circumstances compounded her error and led to the severe consequences that these patients suffered." (AR 002311). The DAB's conclusion is not arbitrary and capricious; it is well-reasoned and takes care to note that even if Dr. Doran wasn't entirely responsible for the end result she was responsible for much of what happened to Patient A in the Columbus VA Center, which was enough to justify the discipline of termination.

**3)  The DAB misconstrued the facility's history of discipline for sedation events when it stated that "other physicians at the facility have received major adverse actions for similar acts of misconduct."**

Dr. Doran argues that the DAB's decision to terminate her was arbitrary and capricious because VA doctors with similar misconduct received no discipline.

The DAB analyzed a variety of factors in deciding to fire Dr. Doran. One of those factors was "Disparate Treatment – Consistency of Penalty with that Imposed on Other Employees." (AR 002309). The DAB noted only that "[o]ther physicians at the facility have received major adverse actions for similar acts of misconduct." (AR 002310). Dr. Doran argues that this finding is not supported by record evidence and is in fact contradicted by evidence she sought to introduce into the record.

Dr. Doran argues that her "male comparators who had sedation events in the past year, all six men, were not subject to discipline in any form." (Pl.'s Mot Summ. J. at 43). Dr. Doran has not provided any record citation to support this assertion[15], and the Court has found nothing in the administrative record to support it. It may be that Dr. Doran is attempting to support this assertion with her "Exhibit B," but "Exhibit B" is not in the administrative record. Even if it was,

_____

[15] In fact, where a citation should be, a placeholder remains: "FIND RECORD CITATIONS HERE." (Pl.'s Mot. Summ. J. at 43).

Dr. Doran's "Exhibit B" is a barebones chart with no detail, and it records no detail of disciplinary action at all.

What is in the record is the DAB Chairman's statement that it was "already established that there were similar people with similar punishments." (AR 002022). Dr. Doran's attorney disagreed, arguing that presenting more evidence of comparable physician discipline was relevant to the extent that it showed the number of times misconduct occurred and whether the VA took steps to counsel the physician before firing them. (*Id.*). The DAB Chairman disagreed, informing Dr. Doran's attorney that "[t]hose people aren't being tried before this Board. Please proceed." (*Id.*). The DAB used several different physicians to determine the consistency of the penalty in Dr. Doran's case, and the DAB Chairman refused to present further testimony on a subject he considered already established.

What was already established was the fact that VA doctors had been terminated for serious misconduct: "One physician who was removed documented in the medical record clinical encounters for which he wasn't present . . . ." (AR 001992). "Another physician documented in the medical record physical examinations that he didn't perform." (AR 001992). "Failure to observe sterile technique during pain procedures was the basis for another one." (AR 001993). Dr. Cooperman and the DAB both concluded that these examples of misconduct were of the same seriousness as Dr. Doran's misconduct, even if they weren't the same type of misconduct.

Dr. Doran makes much of the fact that the comparator disciplinary cases didn't involve a sedation reaction. But to be helpful, the cases just need to be similar; they need not have exactly the same fact pattern. The DAB didn't act arbitrarily and capriciously by comparing the serious misconduct of Dr. Doran's case to the serious misconduct of other doctors who had been terminated.

The DAB's decision was not a clear error in judgment, so the DAB's decision was not arbitrary and capricious. *Taylor*, 92 F. App'x at 276.

**B) Obtained Without Required Procedures**

Dr. Doran argues that the DAB's decision was "obtained without procedures required by law, rule, or regulation having been followed." 38 U.S.C. § 7462(f)(2). The Court "shall review the record and hold unlawful and set aside any agency action, finding, or conclusion found to be . . . obtained without procedures required by law, rule, or regulation having been followed." 38 U.S.C. § 7462 (f)(2). Some courts refer to this section as providing "statutory due process." *Beck*

*v. Shinseki*, No. CV 113-126, 2015 WL 1202196, at *12–13 (S.D. Ga. Mar. 16, 2015). But this statute does not require the Court to set aside any agency action just because the agency procedure wasn't perfect.

This analysis "'mirrors the standards for judicial review of other administrative actions, and analogous administrative law precedents are applicable.'" *Pocha v. McDonald*, No. CV 15-475 (DWF/FLN), 2016 WL 916417, at *4 (D. Minn. Mar. 10, 2016) (quoting *Abaqueta v. United States*, 255 F. Supp. 2d 1020, 1024 (D. Ariz. 2003)). One relevant administrative law precedent is the Administrative Procedure Act (the APA)'s admonition to reviewing courts to take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706 (Scope of Review). That means that a court shouldn't reverse an agency's decision if it made an error that had no bearing on the result. *Sierra Club v. Slater*, 120 F.3d 623, 637 (6th Cir. 1997) (applying APA law).

Dr. Doran claims a variety of failures in the procedure that led to her discipline:

[1] The VA did not properly report Dr. Doran's complaints of harassment from Dr. Borchers prior to the events that gave rise to this complaint that most likely was the impetus for such an aggressive action against her. This is a violation VHA Directive 1124 and many memorandums published to all VA employees from Secretary Sloan Gibson regarding VA's no tolerance policy for harassment and bullying.

[2] The VA did not properly investigate Dr. Doran's patient safety concerns in compliance with VHA Handbook 1050.01, VHA Handbook 1100.19 or the Columbus VA bylaws.

[3] Dr. Borchers admitted that his initial complaints against Dr. Doran were not honest or accurate in violation of 18 U.S.C. Section 1001 regarding false statements.

[4] The VA did not properly follow correct peer review protocol consistent with VHA Directive 2010-025. Further following multipole [sic] peer reviews regarding Patients A, B, C and D which all resulted in a finding that no discipline should occur, Dr. Borchers acted outside of protocol and took it to the PSB.

[5] Although the PSB found that Dr. Doran should not be subject to discipline, Dr. Borchers, without authority and in violation of VA Policy, presented a case against Dr. Doran to the MEB.

[6] The Columbus VA violated its own bylaws and VA policy by not providing Dr. Doran with testimony against her from the 3.12.2015 MEB meeting.

[7] The testimony from the MEB meeting which was allegedly lost was not located until the DAB hearing. At that time, the testimony established that Dr. Borchers had submitted false, misleading and exaggeratory testimony to the MEB.

[8] The VA has charged her with substandard care, but had not provided any standard that has been violated. All of the physicians who testified regarding the VA standard of care (Borchers, Cooperman and Agrawal) agreed that there was no written procedure or standard of care violated by Dr. Doran.

[9] The charges considered during the hearing were different from the charges of which Dr. Doran was given Notice.

[10] The charges related to Patients D were not properly before the DAB and had been closed months before.

[11] AIB was not convened in accordance with VHA Directive 0700. It contained members that compromised its objectivity and did not contain members with "necessary training and experience similar to the subject under investigation". [DAB] The DAB also found that the AIB Report conclusions were technically in-accurate. The DAB testimony of Dr. Cooperman and Mr. Sullivan stated they both relied on the false AIB Report to propose and sustain the charges against Dr. Doran. The DAB ignored these procedural flaws. For these reasons the actions and findings of the DAB were obtained without procedures required by law.

(Pl.'s Mot. Summ. J. at 44–45) (footnotes omitted) (numbering added for ease of reference).

Dr. Doran asserts that the DAB acknowledged these errors. Dr. Doran also asserts that the DAB ignored these errors to her prejudice. But Dr. Doran does not explain how most of the alleged procedural errors contributed to an erroneous finding.

Defendants argue that most of the process Dr. Doran received followed the required procedure, and while there may have been "some technical missteps by the VA," these didn't affect the outcome of Dr. Doran's case. What's more, Dr. Doran was afforded due process through the DAB proceeding: she had the opportunity to present witnesses, cross-examine the agency's witnesses, present documentary evidence, and present argument to the DAB. (Defs.' Mot. Summ. J. at 25).

The DAB did not ignore the "technical missteps by the VA" identified by Dr. Doran. The DAB noted several procedural problems, and it analyzed whether any of the procedural issues affected the outcome. The DAB concluded that it "was satisfied that it had gathered all the evidence it required to make a fair decision, and that Dr. Doran had been afforded due process," even if "[t]he Board had concerns with some aspects of how the Agency formulated and decided the charges." (AR 002299). The DAB addressed the procedural concerns in its opinion "as Dr. Doran had raised them in her defense presentations." (AR 002299). The DAB's analysis of the procedural issues raised by Dr. Doran runs over two pages. (*See* AR 002299–2301).

### 1) Some of the procedural violations alleged by Dr. Doran are unrelated to the DAB's decision to uphold her discharge

Dr. Doran presents a panoply of procedural violations, many of which are wholly unrelated or only tangentially related to the agency's decision to discharge her. Those violations include:

> [1] The VA did not properly report Dr. Doran's complaints of harassment from Dr. Borchers prior to the events that gave rise to this complaint that most likely was the impetus for such an aggressive action against her. This is a violation [of] VHA Directive 1124 and many memorandums [sic] published to all VA employees from Secretary Sloan Gibson regarding VA's no tolerance policy for harassment and bullying.

> [2] The VA did not properly investigate Dr. Doran's patient safety concerns in compliance with VHA Handbook 1050.01, VHA Handbook 1100.19 or the Columbus VA bylaws.

> [3] Dr. Borchers admitted that his initial complaints against Dr. Doran were not honest or accurate in violation of 18 U.S.C. Section 1001 regarding false statements.

(Pl.'s Mot. Summ. J. at 44–45) (footnotes omitted) (numbering added for ease of reference). Some of these may have been violations of VA directives, memoranda, handbooks, or bylaws, but the failure to report Dr. Doran's complaints regarding Dr. Borchers and the failure to properly investigate Dr. Doran's patient safety concerns do not implicate the Agency's decision to discharge Dr. Doran. To the extent Dr. Doran and Dr. Borchers had inter-personal problems, the DAB noted as much. (AR 002302). The second listed procedural issue is ambiguous: it could refer to a patient-safety concern lodged by Dr. Doran, or it could refer to patient-safety concerns lodged by others against Dr. Doran. To the extent that it is relevant at all, the DAB went to great lengths to ensure that it analyzed the concerns raised by Dr. Doran and against Dr. Doran.

Dr. Doran—in issue number three—argues that Dr. Borchers violated the U.S. Code's criminal prohibition on making false statements "in any matter within the jurisdiction of the executive, legislative, or judicial branch," when he made dishonest or inaccurate statements in his initial complaints against Dr. Doran. 18 U.S.C. § 1001. But this Court sets aside the agency's action if it was "obtained without procedures required by law, rule, or regulation having been followed." 38 U.S.C. § 7462 (f)(2). Section 1001 of the criminal code is not a "procedure required by law" for the VA to follow but a statute criminalizing certain behavior. Thus, even if

someone is criminally liable under § 1001 for a statement made in the course of a VA investiga-tion, it doesn't per se implicate an absence of procedure.

In short, to the extent any procedural error actually exists relating to issues one through three, that error is wholly or partly unrelated to the VA's decision. To the extent these errors are related, they were harmless.

### 2) The DAB expressly acknowledged some of the alleged procedural problems and stated they did not affect the DAB's decision

Dr. Doran presents a variety of other procedural problems that the DAB expressly acknowledged, specifically issues four through eight, ten, and eleven, but the DAB concluded that these problems did not prevent it from making a fair decision nor did the problems prevent Dr. Doran from being afforded due process. (*See* AR 002299).

Problem four: the DAB acknowledged the issues with the peer reviews of Dr. Doran's cases, and it even agreed that the peer reviews were "of poor quality." (AR 002299). But the DAB didn't find the peer reviews supplied by Dr. Doran to be helpful either. (AR 002299). In any event, the DAB itself reviewed each of the four patients' cases and drew its own conclu-sions, not relying on the findings and conclusions of the peer reviews. Therefore, even if the Agency did not follow the proper peer-review protocol, its error caused Dr. Doran no prejudice because of the DAB's own thorough review of each of Dr. Doran's peer-reviewed cases.

Problem five: Dr. Doran asserts that Dr. Borchers violated VA policy by presenting a case against Dr. Doran to the Medical Executive Board (the "MEB"). Dr. Doran does not tell the Court which VA policy Dr. Borchers violated in presenting his concerns about Dr. Doran to the MEB. But even if this did violate VA policy, the error was harmless because the DAB performed its own factfinding; it didn't just rely on the findings of the MEB.

Problems six and seven: Dr. Doran argues that the VA violated its own policy when it failed to provide her with a transcript of the March 12, 2015 meeting of the MEB until the DAB hearing. (Pl.'s Mot. Summ. J at 45). Again, Dr. Doran points to no specific VA policy or bylaw of the Columbus VA Center that required the MEB to provide her a transcript of the proceedings. Section 5.04 of the Columbus VA Center bylaws states that each committee must "prepare and maintain reports" of the committee's recommendations, actions, and evaluations. (AR 001003). It's true that "[w]ritten minutes are maintained for all meetings of the [Medical Executive Com-mittee of the Executive Management Board], and shall be open for viewing by providers [like

Dr. Doran] who hold membership or privileges on the Medical Staff." (AR 000999). But Dr. Doran goes beyond that, arguing that the VA didn't follow procedure when it failed to provide her "testimony" from the March 12, 2015 meeting. In short, Dr. Doran doesn't point to a law, rule, or regulation that the VA violated here. Regardless, Dr. Doran did receive a transcript of the MEB hearings eventually.

Problem seven: Dr. Doran argues that the testimony at the MEB meeting established that Dr. Borchers submitted false, misleading, and exaggerated testimony to the MEB. (Pl.'s Mot. Summ. J. at 45). The DAB "found substance to this complaint, listing numerous examples of Dr. Borchers's exaggerations or misrepresentations. (AR 002299–2300). In its credibility assessment of Dr. Borchers as a witness, the DAB observed—in addition to finding Dr. Borchers's statements to the PSB and MEB as containing many inaccuracies—that while "there were personal difficulties between Dr. Borchers and Dr. Doran, and [Dr. Borchers] had been pursuing a course of progressive discipline against Dr. Doran for the preceding six months," it "believe[d] that his answers before the Board represented truthful answers." (AR 002302). And again, while it's possible that Dr. Borchers was on a mission to see Dr. Doran fired, the DAB conducted its own fact-finding and assessment of each of Dr. Doran's cases. The DAB reached its own conclusions and didn't rely on those of a potentially biased Dr. Borchers. And as such, this asserted procedural problem was harmless error if it was an error at all.

Problem eight: Dr. Doran argues that she was charged with failure to provide care consistent with the standard of care, but the Agency failed to articulate any clear standard of care. (Pl.'s Mot. Summ. J. at 46). Again, Dr. Doran points to no law, rule, or regulation that the Agency failed to follow in reaching its findings or taking its action. The DAB provided ample reason why Dr. Doran's care provided in Charge 1 was sub-standard: she "inadequately and inappropriately assessed the risk that sedation posed to the patient's airway," she used a dangerous technique to sedate the patient, and she performed poorly in response to Patient A going into cardiac arrest after she administered anesthesia. (AR 002303). Dr. Doran may be correct that the DAB pointed to no express standard of care, but it provided ample evidence and came to the unanimous conclusion that Dr. Doran failed to provide the standard of care with regards to Charge 1, Specification 1.

Problem ten: Dr. Doran argues that the charges related to Patient D were not properly before the DAB and had been closed months before. (Pl.'s Mot. Summ. J. at 46). Yes, that's true,

and the DAB acknowledged this, (AR 002300), and suggested that Dr. Doran had already been informed of the process she should have used. The DAB concluded, 2-1, that Charge 4 (relating to Patient D) should not be sustained. (AR 002308). Since the DAB didn't sustain Charge 4, even if Charge 4 shouldn't have been before the DAB at all, it didn't matter.

Problem eleven: Dr. Doran argues that the Administrative Investigation Board ("AIB") was not convened in accordance with VHA Directive 0700. The AIB investigated the events surrounding Patient A. The DAB acknowledged the problem, detailing the various aspects of the AIB's composition that were inadequate. (AR 002300). It went on to observe that the AIB's conclusions were technically inaccurate. (*Id.*). But again, the DAB performed its own factfinding and reached its own conclusions regarding all of the issues investigated by the AIB. There is no evidence the DAB's decision was tainted by any procedural problems with the AIB report.

### 3) Still other alleged procedural problems lack merit

Dr. Doran argues that "[9] The charges considered during the hearing were different from the charges of which Dr. Doran was given Notice." (Pl.'s Mot. Summ. J. at 46). That's not true. Dr. Doran received notice of the four charges and their specifications (AR 000001–0004). Those were either identical or substantially similar to the four charges considered by the DAB: "Charge 1: Failure to Provide the Standard of Care," (AR 002302); "Charge 2: Lack of Candor," (AR 002305); "Charge 3: Inappropriately Documenting in a Patient Record," (AR 002307); and "Charge 4: Performing a procedure without the appropriate privileges," (AR 002308). There is no merit to Dr. Doran's argument that the charges considered by the DAB were different from those of which she was given notice.

### 4) The DAB procedure cured whatever procedural maladies infected earlier procedures

The DAB gave Dr. Doran a "meaningful opportunity to present [her] case." *Flatford v. Chater*, 93 F.3d 1296, 1306 (6th Cir. 1996) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976)). Dr. Doran herself was asked if she believed she had a full opportunity to present her side of the case to which she responded, "Finally." (AR 002295). And that came on page 1027 of the DAB hearing transcript, which recorded a hearing that lasted for two days. The DAB provided Dr. Doran with due process. It reached its own conclusions based on its own fact finding, so while perhaps Dr. Doran is right, that the earlier proceedings were infected by Dr. Borchers's animus towards her, the DAB reviewed all the evidence independently and expressly noted Dr.

Borchers's problematic testimony. The DAB reached its own conclusions after its own thorough review of the facts.

### C) Unsupported by Substantial Evidence

Dr. Doran argues that the DAB's decision isn't supported by substantial evidence for two reasons: (1) the substantial weight of the evidence favored Dr. Doran because the majority of the peer reviews concluded that her treatment of Patient A met the standard of care, and (2) the DAB relied on hearsay evidence in reaching its penalty decision, and hearsay evidence isn't substantial evidence; therefore, the DAB's penalty decision isn't supported by substantial evidence.

The Court "shall review the record and hold unlawful and set aside any agency action, finding, or conclusion found to be . . . unsupported by substantial evidence." 38 U.S.C. § 7462 (f)(2). "To determine whether the board's findings are supported by substantial evidence, the court must determine whether the board considered 'such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached.'" *Taylor v. Principi*, 92 F. App'x 274, 277 (6th Cir. 2004) (quoting *R.P. Carbone Constr. Co. v. Occupational Safety & Health Review Comm'n,* 166 F.3d 815, 818 (6th Cir. 1998)). Might is the key word here, because even if the reviewing court would decide the issue differently, as long as there's substantial evidence to support the agency decision, the reviewing court must affirm the decision. *Id.* "Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence." *R.P. Carbone*, 166 F.3d at 818. That's the quantum of evidence required, and it's not much.

### 1) The DAB did not err by rejecting certain peer reviews

Dr. Doran's main critique of the DAB in this regard is that it disregarded some expert opinions in exchange for its own. Indeed, the DAB found that most of the peer reviews in the record before it were "of poor quality." (AR 002299). But it appears the DAB analyzed each peer review, because it found that Dr. Gibbons's peer review was "well reasoned." (AR 002299). In any event, the DAB consisted of experts who performed their own review after what appears to be a careful analysis of the medical records themselves, the testimony of the many witnesses, and the documentary evidence presented to them. For example, the DAB reviewed the medical records for Patient C in detail. (*See* AR 002304–2305).

### 2) The DAB did not err by considering relevant hearsay evidence

Hearsay sometimes infects the administrative record. But even hearsay, if "relevant and material . . . may constitute substantial evidence." *R.P. Carbone* at 819. But "[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence." *Lerner v. Shinseki*, No. 3:12-CV-00565, 2013 WL 5592906, at *6 (W.D. Ky. Oct. 10, 2013) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 230 (1938)). Courts apply a multi-factor test to determine whether hearsay evidence constitutes substantial evidence, "when hearsay evidence is the sole basis for agency action." *Myers v. Sec'y of Health & Human Servs.*, 893 F.2d 840, 846 (6th Cir. 1990).

But hearsay evidence is not the sole basis for the DAB's action here; the DAB only used hearsay evidence as one piece of evidence supporting its penalty determination. The DAB weighed a number of factors to determine that Dr. Doran should be terminated. One of those factors was "notoriety." (AR 002310). Under this factor the DAB noted:

> This was Dr. Doran's single recorded sedation event in six years. Unfortunately, it was the initiating factor in a chain of events that caused severe injury to a patient. The result is that a significant tort claim has been filed against the facility. The existence of this tort was mentioned by Mr. Sullivan and Dr. Cooperman as having bearing on their decision.
> Borchers P 648 (sic) "If the events of January 26/27 hadn't happened we would not be here" Cooperman P726 "I felt the outcomes were so severe that the proposed termination was the proper course" Sullivan P803 "Part of the discussion was the bad outcome" P 804 "It was part of the thought process"

(AR 002310).

Dr. Doran argues that the DAB's decision was in part based on facts not in the record, specifically, the existence of a "significant tort claim" and the "severe injury" for Patient A. Dr. Doran asserts that the VA "admits to not having reviewed the hospital records directly for Patient A to determine what actually caused his extended critical care . . . . [even though] the medical records for Patient A were requested and not admitted into evidence nor was Dr. Doran given access to them to establish whether her sedation event was the cause for the resulting prolonged hospital stay." (Pl.'s Mot. Summ. J. at 43).

Dr. Doran argues that the only evidence of a "severe injury" or prolonged hospital stay or significant tort claim is through the testimony of Dr. Cooperman and Mr. Sullivan, and they both testified they had no actual knowledge of what caused Patient A's long hospitalization after the

sedation event. This constitutes hearsay, which is sometimes admissible and may count as substantial evidence.

The information regarding Patient A's condition and the tort claim came from Dr. Cooperman. He received "regular updates at morning report on patients that are - - patients of ours that are hospitalized at private hospitals from our utilization review nurses or navigation nurses, and so we received daily updates on Patient A's condition until the time that he was transferred to a nursing facility." (AR 02006–2007). Dr. Cooperman testified that it was his "understanding . . . that [Patient A] was in the Intensive Care Unit, and that he was in the ICU for approximately 30 days. . . . . [and] we did an institutional disclosure to his wife, and she has filed a tort claim for $3 million against the Agency." (AR 001972). Mr. Sullivan said "I know the patient was in critical care for quite a long time and ended up in a nursing home, and I don't believe he was in a nursing home before he came to us for the procedure. So it was a serious incident." (AR 002054).

The hearsay testimony at issue here is more than rumor: Dr. Cooperman's statements were derived from regular reports used to track patients that have been hospitalized after being treated at the Columbus VA Center. The hearsay evidence bears some indicia of reliability.

In short, the DAB didn't err by using hearsay testimony that was consistent between two witnesses as one part of a much larger analysis. Holding otherwise would force administrative boards to comb through the record and banish all hearsay, regardless of its import—doing otherwise would invite reversal. For good reason, that's not the rule.

### D) The *Douglas* Factors

Dr. Doran argues that the VA didn't administer the proper penalty given the facts as it found them. A list of factors guides the VA in determining the appropriate penalties in discipline cases. Those factors include:

> (1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

> (2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

> (3) the employee's past disciplinary record;

（4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

（5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties;

（6) consistency of the penalty with those imposed upon other employees for the same or similar offenses;

（7) consistency of the penalty with any applicable agency table of penalties;

（8) the notoriety of the offense or its impact upon the reputation of the agency;

（9) the clarity with which the employee was on notice of any rules that where violated in committing the offense, or had been warned about the conduct in question;

（10) potential for the employee's rehabilitation;

（11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and

（12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

*Douglas v. Veterans Admin.*, 5 M.S.P.B. 280, 305–06 (1981) (footnote omitted). But neither the VA nor this Court needs to consider each factor; only relevant factors need to be considered. *See Purifoy v. Dep't of Veterans Affairs*, 838 F.3d 1367, 1371 (Fed. Cir. 2016). And not every factor deserves equal weight; one weighty factor might outweigh several minor factors that cut the other way. *See Buckner v. U.S. Postal Serv.*, 554 F. App'x 906, 911 (Fed. Cir. 2013) ("[T]he seriousness of Petitioner's conduct outweighed any mitigating factors."). "The appropriate standard of review for a penalty determination is an abuse of discretion standard. Indeed, deference is appropriate unless the penalty is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion." *Schuck v. Frank*, 27 F.3d 194, 197 (6th Cir. 1994) (internal quotation marks omitted) (quoting *Parker v. United States Postal Serv.*, 819 F.2d 1113, 1116 (Fed. Cir. 1987)).

The Court finds that deference to the reasoned opinion of the DAB is appropriate in this case. The penalty of termination is not so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion. Here, the DAB considered each relevant factor, considering nine factors in all. The DAB found three factors to be particularly important.

First, the offense was quite serious. Regardless of the extent to which Patient A's long-term hospitalization was the result of Dr. Doran's care, the DAB found that she provided substandard care that resulted in the code blue with Patient A and she provided substandard care in response to the code blue, which led to a worse outcome for Patient A.

Second, the DAB was concerned that there was little possibility to restore her to a position working with Dr. Borchers because of their frayed relationship. (AR 002309). This weighed in favor of termination because of the "erosion of supervisory confidence." This was only exacerbated by Dr. Doran's refusal to accept responsibility for her actions. This, the DAB thought, made it unlikely that she had much potential for rehabilitation. (AR 002310). These factors support the DAB's decision, indicating why a suspension and re-training were not an acceptable disciplinary sanction. (*See* AR 002311).

Third, the DAB found that the existence of a $3 million tort claim against the VA was a major factor in the seriousness and notoriety of the incident. (AR 002310).

All of these factors and more led the DAB to the reasonable conclusion that discharging Dr. Doran was a warranted and prudent course of action. The Court will not disturb the DAB's reasoned conclusion—it didn't abuse its discretion here.

## IV) Conclusion

Plaintiff's Motion for Summary Judgment is **DENIED**. (Doc. 30). Defendants' Motion to Affirm the Decision of the DAB is **GRANTED**. (Doc. 31). The DAB's decision is **AFFIRMED**. The clerk is directed to enter judgment for Defendants.

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: February 9, 2018